# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**DEREK N. MOORE (#390963)**                                    **CIVIL ACTION**

**VERSUS**

**N. BURL CAIN, ET AL.**                                         **NO. 14-0297-JJB-EWD**

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the U. S. District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 14 days after being served with the attached report to file written objections to the proposed findings of fact, conclusions of law, and recommendations set forth therein. Failure to file written objections to the proposed findings, conclusions and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in Baton Rouge, Louisiana, on September 7, 2017.

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

DEREK N. MOORE (#390963)                                    CIVIL ACTION

VERSUS

N. BURL CAIN, ET AL.                                        NO. 14-0297-JJB-EWD

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Before the Court is the application by Petitioner Derek N. Moore for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons that follow, Petitioner's application should be denied. There is no need for oral argument or for an evidentiary hearing.

### I. Procedural History

On May 10, 2007, Petitioner was charged by grand jury indictment in the Nineteenth Judicial District Court for the Parish of East Baton Rouge, State of Louisiana, with one count of second-degree murder and one count of attempted second-degree murder. Discovery motions were filed on Petitioner's behalf by his retained counsel. The State thereafter responded to Petitioner's discovery requests on July 19, 2007 and filed a reciprocal motion for discovery, requesting therein information relative to any potential alibi witnesses. Petitioner did not respond to the State's discovery requests, however, until the morning following the commencement of jury selection, September 16, 2008, at which time Petitioner indicated that he intended to present an alibi witness. The State objected and sought to exclude the testimony of the alibi witness. Upon a determination by the trial judge that Petitioner failed to show good cause for the delay in notice, the court excluded Petitioner's alibi witness. Although Petitioner sought supervisory review of this determination before the intermediate appellate court and the Louisiana Supreme Court,

Petitioner's supervisory writ applications were denied, and the matter proceeded to trial. *See State v. Moore*, 992 So.2d 971 (La. 2008).

On September 18, 2008, the jury found Petitioner guilty on both counts. Upon the denial of post-trial motions, the trial judge sentenced Petitioner on January 29, 2009, to life imprisonment in connection with the second degree murder charge and to fifteen years in confinement in connection with the attempted second-degree murder charge, without the benefit of probation, parole or suspension of sentence, with these sentences to run concurrently.

Petitioner pursued a direct appeal, asserting both counseled and *pro se* issues for review, principally arguing that the trial judge erred in excluding his alibi witness and that the evidence was insufficient to support the verdict. On May 7, 2010 the Louisiana Court of Appeal for the First Circuit affirmed Petitioner's convictions and sentences. *State v. Moore*, 39 So.3d 850, 2010 WL 1838314 (La. App. 1 Cir. 2010). Petitioner sought further review before the Louisiana Supreme Court and, on January 7, 2011, that Court denied review, without comment. *See State v. Moore*, 52 So.3d 882 (La. 2011). Petitioner also filed a writ of certiorari in the United States Supreme Court and, on May 16, 2011, that Court denied review. *See Moore v. Louisiana*, 563 U.S. 993 (2011).

Petitioner filed a *pro se* application for post-conviction relief ("PCR") on or about November 23, 2011. Petitioner asserted therein (1) that the trial court erred in rejecting his claim that the prosecution exercised a challenge to an African-American juror on the basis of race in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), (2) that he was denied his Sixth Amendment right to a trial by an impartial jury drawn from a fair cross-section of the community, (3) that the prosecution engaged in misconduct by vouching for the credibility of the State's principal witness and by commenting upon Petitioner's failure to testify at trial, (4) that he was provided with

ineffective assistance of counsel at trial because his trial attorney failed to conduct an adequate investigation, and (5) that the evidence was insufficient to support the verdicts. The State filed procedural objections, asserting (1) that Petitioner's claims numbered 1-3 should be rejected pursuant to La. Code Crim. P. art. 930.4(B) because they were inexcusably omitted from Petitioner's direct appeal, and (2) that Petitioner's claim number 5 should be rejected pursuant to La. Code Crim. P. art. 930.4(A) because it was repetitive, having been fully addressed in connection with Petitioner's direct appeal. On March 22, 2013, the State Court Commissioner issued a Report recommending that Petitioner's claims numbered 1 through 4 be denied for lack of merit and that Petitioner's claim number 5 be denied as procedurally barred as repetitive pursuant to La. Code Crim. P. art. 930.4(A). On May 6, 2013, the trial court accepted the Commissioner's Recommendation and denied Petitioner's PCR application, finding claim number 5 to be procedurally barred as repetitive and claims numbered 1 to 4 to be "factually insufficient to warrant relief or otherwise without merit."[1]

---

[1]      There is ambiguity in the state court record with regard to whether the substantive issues asserted in Petitioner's PCR claims numbered 1-3 were found by the state trial court to be procedurally barred and were therefore treated, in the alternative, as claims asserting the ineffectiveness of Petitioner's appellate attorney in failing to present and preserve these claims on direct appeal. Specifically, Petitioner recognized in his PCR application that these claims likely should have been raised on direct appeal, but he requested that they nonetheless be substantively reviewed and he asserted, *effectively in the alternative*, that his appellate attorney provided ineffective assistance in failing to present them. The State then responded to Petitioner's application by arguing that these claims were in fact procedurally barred and should be rejected for this reason. The subsequent Commissioner's Report inferentially accepted the State's argument regarding procedural default because the Report thereafter addressed each of these claims solely as claims of the ineffectiveness of Petitioner's appellate counsel. Notwithstanding, neither the Commissioner's Report nor the trial judge's decision accepting the Report explicitly addressed the issue of procedural default or made any explicit determination that the substantive claims were procedurally barred. In fact, the trial judge's Ruling on Petitioner PCR application stated only that these claims were "factually insufficient … or otherwise without merit." Nor has the State, in its response to the Petitioners instant federal habeas corpus application, raised the issue of procedural default but has instead treated these claims solely as ineffectiveness claims notwithstanding that Petitioner's application clearly presents both the substantive issues and, only

Petitioner thereafter filed an application for supervisory review in the Louisiana First Circuit Court of Appeal. The First Circuit Court denied review on August 28, 2013. *State v. Moore*, 2013 WL 12120767 (La. App. 1 Cir. Aug. 28, 2013). Petitioner sought further review in the Louisiana Supreme Court, which Court denied review on April 25, 2014. *State ex rel. Moore v. State*, 138 So.3d 638 (La. 2014).

Petitioner signed his federal habeas corpus application on or about May 13, 2014, and it was electronically submitted to this Court and filed on May 14, 2014. Petitioner asserts the following grounds for relief:

Ground One: The trial court erred in rejecting a claim that the prosecution exercised a challenge to an African-American juror on the basis of race in violation of *Batson v. Kentucky, supra*;

Ground Two: He was denied his Sixth Amendment right to a trial by an impartial jury drawn from a fair cross-section of the community;

Ground Three: The prosecution engaged in misconduct by vouching for the credibility of the State's witness and by commenting upon Petitioner's failure to testify at trial;

Ground Four: He was provided with ineffective assistance of counsel at trial because his trial attorney failed to conduct an adequate investigation;

Ground Five: There was insufficient evidence to support the verdicts; and

Ground Six: The trial court failed to conduct a balancing test before excluding the testimony of his alibi witness at trial.

## II. Factual Summary

The facts, as summarized in the opinion of the Louisiana Court of Appeal for the First

_____

in the alternative, the ineffectiveness issues. Considering that the state court record does not establish that Petitioner's substantive issues were ever rejected on procedural grounds, this Court is unable to conclude that these substantive issues are procedurally defaulted. Accordingly, the Court will address Petitioner's claims numbered 1-3 as the substantive claims that they explicitly purport to be.

Circuit, are as follows:

> On or about March 16, 2007, at about 10:30 p.m., a gunman knocked on the door of a residence located at 864 North 38th Street in Baton Rouge, Louisiana and held the victim, Cathy Brumfield, at gunpoint as he entered the home. The gunman asked about money and for a person named Gilbert. The gunman then began firing his weapon. Officers of the Baton Rouge City Police Department were dispatched to the residence. Upon their arrival, the officers learned that it was the scene of the shooting of victims Kevin Lee and Ms. Brumfield. Ms. Brumfield died as a result of injuries suffered from the shooting. The defendant was identified as the shooter of both victims.

*See State v. Moore, supra*, 2010 WL 1838314, *1.

In addition to the foregoing, the evidence adduced at trial reflects that on the morning of the shooting, March 16, 2007, one of the victims, Kevin Lee, was contacted by Petitioner and a third person, Gilbert Schuler, for the purpose of arranging a drug purchase that was to occur later that day at Lee's house. Lee and Petitioner were well-acquainted and had known each other for years because Petitioner was married to Lee's cousin Alisha. According to Lee, he usually referred to Petitioner by the nickname "Dot."

At some point that day, the three men met at Lee's house, and Petitioner gave Gilbert Schuler $4,600 to purchase narcotics. Schuler did not have the narcotics in his possession, however, so Lee loaned Schuler his vehicle to go retrieve the drugs. Notwithstanding, Schuler did not return, and after waiting for a period of time, Lee and Petitioner began making calls to determine what had happened to Schuler. According to Lee, the men learned that Schuler may have abandoned the vehicle in an attempt to evade police. Lee and Petitioner then went out to retrieve Lee's abandoned car and to look for Schuler, but they were unsuccessful and returned to Lee's house. Along the way, Petitioner stopped at Lee's aunt's house to retrieve two handguns.

Once back at Lee's house, Petitioner's wife Alisha arrived and inferentially suggested to Petitioner that Lee and Schuler may have been working together to take Petitioner's money.

Petitioner eventually left Lee's house, telling Lee that it was "not about the money anymore" and that when Petitioner found Schuler, it was going to be "me and him."

Later that evening, Lee cooked some food outside on a grill and then came in to take a bath. At that time, Lee's fiancée Cathy Brumfield and her son Darius were also in the house. Lee testified that he was in the bath and heard a knock at the front door, after which Cathy came to the bathroom door and said that his cousin "Dot" was there. Lee told Cathy to tell "Dot" he was getting out of the tub and coming, but shortly thereafter, Lee heard Cathy call his name, and then the bathroom door flew open, and Petitioner began shooting at Lee, striking Lee seven times in the head and body. Lee fell back in the tub and subsequently heard two more shots. When he was able to exit the bathroom, he found that Cathy had also been shot, and she kept repeating to him, "why your cousin shot me?"

Cathy's son Darius, who was fourteen years old at the time, testified that he was in his bedroom and heard a knock on the front door that Cathy answered. Darius then heard his mother and sister screaming, so he came to the door of his bedroom and saw a man with "twists" in his hair, who Darius was told by Lee was "Dot," holding a gun to his mother's head. Darius retreated into his bedroom and closed the door. Darius testified that through the door he heard the man asking about money and asking for a man named "Gilbert" and then heard gunshots. When he later exited his bedroom, he found that his mother and Lee had been shot several times.

Police officers showed a six-person photographic lineup to Lee, and he identified Petitioner as the perpetrator of the shootings.[2] Police also exhibited the photographic lineup to Darius, but

---

2       Defense counsel pointed out that a notation in the police investigative file reflected that Lee did not initially identify Petitioner as the shooter from the photographic line-up. *See* Record at p. 39. The notation also reflects, however, that Lee was "heavily medicated and barely coherent" at the time and that investigators planned to return at a later time when identification was anticipated to be "very likely."

Darius was unable to identify Petitioner, possibly because in the photograph of Petitioner, he not have the "twists" or braids that Darius had observed on the night of March 16, 2007.

Finally, on March 21, 2007, several days after the incident, police officers apprehended Petitioner after a brief chase. According to police, they received a tip that Petitioner was driving a silver or gray Lincoln Navigator in an area known as the "Avenues" in Baton Rouge, and officers were dispatched to the area to search for it. A vehicle matching that description was subsequently observed to stop at a nearby grocery store and a black male was observed entering the store. Police entered the store only to find that the black male had exited the rear thereof. The officers then observed a man running from the store and attempting to jump a fence and evade capture. The man was subsequently apprehended and identified as Petitioner and was discovered to have the keys to the Lincoln Navigator in his pocket.

Based on the foregoing, the jury returned a verdict finding Petitioner guilty of the charged offenses.

### III. Applicable Law and Analysis

<u>Standard of Review</u>

Turning to a consideration of Petitioner's claims, the standard of review in this Court is that set forth in 28 U.S.C. § 2254(d). Under this statute, an application for a writ of habeas corpus shall not be granted with respect to any claim that a state court has adjudicated on the merits unless the adjudication has "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Relief is authorized if a state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law

or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Relief is also available if the state court identifies the correct legal principle but unreasonably applies that principle to the facts of the petitioner's case or reaches a decision based on an unreasonable factual determination. *See Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000). Mere error by the state court or mere disagreement on the part of this Court with the state court determination is not enough; the standard is one of objective reasonableness. *Id. See also Williams v. Taylor, supra*, 529 U.S. at 409 ("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable"). State court determinations of underlying factual issues are presumed correct, and Petitioner has the burden to rebut the presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *McCamey v. Epps*, 658 F.3d 491, 497 (5th Cir. 2011). Review under § 2254(d)(1) focuses on what a state court knew and did. *Cullen v. Pinholster, supra*, 563 U.S. at 182. "[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas corpus petitioner must overcome the limitation of § 2254(d)(1) based on the record that was before that state court." *Id*. at 184. State court decisions are measured against the Supreme Court's precedents as of "the time the state court renders its decisions." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). *Pinholster* prohibits a federal court from using evidence that is introduced for the first time at a federal-court evidentiary hearing as the basis for concluding that a state court's adjudication is not entitled to deference under § 2254(d). *Blue v.*

*Thaler*, 665 F.3d 647, 656 (5th Cir. 2011).[3]

To determine whether a particular decision is "contrary to" then-established law, a federal court must consider whether the decision "applies a rule that contradicts [such] law" and how the decision "confronts [the] set of facts" that were before the state court. *Williams v. Taylor*, 529 U.S. 362, 405, 406 (2000). If the state court decision "identifies the correct governing legal principle" in existence at the time, a federal court must assess whether the decision "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

The State contends that, applying this standard to Petitioner's claims, there is no basis for the granting of habeas corpus relief.

Petitioner's Claim No. 1, Regarding The Trial Court's
Failure To Uphold A *Batson* Challenge, Is Without Merit

Petitioner first asserts that the trial court erred in overruling Petitioner's objection to the alleged race-based use of peremptory challenges by the State pursuant to *Batson v. Kentucky, supra.* Petitioner asserts that potential juror Tangi Williams was dismissed by the prosecution because she was African-American. He further maintains that the "race neutral" reason provided by the State for excusing this potential juror was inadequate.

The United States Supreme Court held in *Batson* that an equal protection violation occurs when a party uses a peremptory challenge to exclude a prospective juror on the basis of race. If the challenger makes a *prima facie* showing of discrimination in the exercise of peremptory strikes, the burden shifts to the opposing party to offer racially neutral explanations for the challenged

---

[3]      The Fifth Circuit Court of Appeals has held that a federal court may properly hold an evidentiary hearing when it determines, based solely on the state court record, that the state court's determination was contrary to or involved an unreasonable application of clearly established federal law. *Bobby Smith v. Burl Cain*, 708 F.3d 628, 634 (5th Cir. 2013).

juror. This second part of the process does not require the State to give an explanation that is plausible, or even persuasive, so long as it is not inherently discriminatory. *Purkett v. Elem*, 514 U.S. 765, 768 (1995). If a race-neutral reason is given, the trial court must then decide whether the challenger has proven purposeful discrimination. This third and final step in the *Batson* analysis involves an examination of the credibility of the State's race-neutral reasons, but the ultimate burden of persuasion as to racial motivation in exercising a peremptory challenge rests with, and never shifts from, the defendant. *Id. See also Hernandez v. New York*, 500 U.S. 352 (1991). Whether there has been intentional racial discrimination is a question of fact, *Moody v. Quarterman*, 476 F.3d 260 (5th Cir. 2007), and the trial court's evaluation of discriminatory intent is to be accorded great deference on review, and should not be reversed unless it is clearly erroneous. *Id*.

Petitioner directs this Court's attention to a decision of the United States Supreme Court in *Miller-El v. Dretke*, 545 U.S. 231 (2005), wherein habeas relief was granted to a petitioner in a case involving allegations of purposeful discrimination under *Batson*. In *Miller-El*, the Supreme Court observed that, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." *Id*. at 241. The *Miller-El* case, however, has not been determined to alter the standard of review set forth in *Batson. See Rice v. Collins*, 546 U.S. 333 (2006), wherein the United States Supreme Court restated and employed the three-step *Batson* analysis. *See also Moody v. Quarterman, supra*.

A review of the record in this case reflects that, after the exercise of six peremptory challenges in connection with the second jury panel, Petitioner's counsel interposed an objection based upon *Batson*, complaining that the State had challenged three of the four black members on

the panel, whereupon the trial court requested that the prosecution provide reasons for the opposed challenges. *See* Tr. at p. 336. In response, the State responded as to one of the three prospective jurors, Derek Bell, that he had indicated that he did not want to serve as a juror and that, as a truck driver, "he would rather be out there making money because he [was] losing money" by being there. As to the remaining two prospective jurors, Linda Guerin and Tangi Williams, the State indicated that it had challenged these jurors because they were teachers, and the State had challenged all teachers on the panel, including another person, Juan Barroso, whose race was listed as "other." The State further noted, in support of its contention that it was not excluding jurors for reasons of race, that it had retained an African-American juror from the first panel and was retaining an African-American juror from the second panel as well.

After the provision of these purported race-neutral rationales by the State for the exclusion of the three prospective jurors, the trial court judge ruled that the articulated race-neutral reasons were sufficient to justify the peremptory challenges. This Court does not find the trial court's ruling to be clearly erroneous. First, as for Derek Bell, the judge acknowledged that the prospective juror had indicated that he did not want to be a juror, and the judge accepted that reasoning for challenging Mr. Bell. Second, with regard to Linda Guerin, the court acknowledged that the State's proffered rationale for this prospective juror was that she was a teacher, but the court then essentially found that Petitioner's objection as to this juror was mooted by the fact that Petitioner had also exercised a peremptory challenge as to Ms. Guerin. Finally, as for Tangi Williams, the court noted that the State had indeed challenged all persons on the panel who were teachers, both African-Americans and a prospective juror whose race was listed as "other." The court then accepted this purported race-neutral reason for challenging Ms. Williams, noting that the court "does not find it to be race motivated." Tr. at p. 337. In this regard, it has often been

noted that the trial judge is in the best position to determine whether a race-neutral explanation is offered in good faith or is a subterfuge for racial bias. In the instant case, there is nothing in the record that rebuts the determination of the trial court that the State's expressed reasons for exclusion were non-pretextual and were legitimate grounds for exercise of the challenges against the prospective jurors at issue. Although Petitioner would seek to rely upon *Miller-El* to contend that the rationale given by the State was pretextual, he has pointed to no side-by-side comparison, as was offered in *Miller-El* between challenged jurors and accepted jurors, which would tend to show discriminatory intent. Accordingly, the trial court did not err in concluding that Petitioner failed to meet his burden of proof in showing discriminatory intent.

Petitioner's Claim No. 2, Regarding
Petitioner's Fair Cross-Section Claim, Is Without Merit

Petitioner next asserts that he was denied a fair trial by a representative cross-section of the community because the number of African-Americans included in the jury pool on the morning of trial, approximately 9 individuals out of 50 in all, was disproportionate to the number of African-Americans in the community as a whole, which he represents to be approximately 50 percent.

Petitioner's claim should be rejected. The record reflects that when Petitioner's attorney objected to the lack of diversity in the jury pool, he expressed the speculative concern that recent hurricanes may have impacted some communities more than others, with the result that "[t]hose individuals may not have been able to be present for the jury panel or for jury management at this time," and "it is a realistic expectation that because some people were hard hit or were not able to recover as quickly as some other people in our community, that those individuals have not been able to come to court to be part of the jury panel." Tr. at p. 159. Petitioner's attorney, however made clear that he was "in no way indicating that this is the State's fault that this has come up this way." *Id.* In response to Petitioner's objection, the trial court overruled same, noting that neither

the court nor the prosecution had any involvement in choosing who was included in any individual jury pool and that the court had not been informed by the court's Jury Management of any particular problem caused by the referenced hurricanes or with their having impacted upon the ability of "a certain population of people" to be present for jury duty. *Id*. at p 160. Notwithstanding, in response to defense counsel's assertion that he "just want[ed] to make sure that not an extraordinary amount of people in certain areas of town have refused to come or been unable to come," the Court indicated that it would make an inquiry to Jury Management during a break and would revisit its determination if warranted. *Id*. at p. 161. The record reflects that no further discussion was had relative to this issue.

The Sixth Amendment guarantees a criminal defendant the right to have his or her jury chosen from a venire or panel representing a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 527-30 (1975). The *Taylor* Court arrived at this conclusion by recognizing that (1) "the Sixth Amendment's provision for jury trial is made binding on the States by virtue of the Fourteenth Amendment," *id*. at 526, (2) "the American concept of the jury trial contemplates a jury drawn from a fair cross section of the community," *id*. at 527, and (3) the selection of a jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial. *Id*. at 528. Interestingly, the Supreme Court cited a long line of equal protection cases outlawing the purposeful exclusion of racial and ethnic groups from service on juries in support of its interpretation of the Sixth Amendment's fair cross-section requirements. The Supreme Court also acknowledged that its holding in *Taylor* announced a new rule of constitutional criminal procedure. *Id*. at 535-36.

Notwithstanding the foregoing, the Supreme Court also emphasized that its construction of the Sixth Amendment does not deprive the States of the opportunity to determine appropriate

qualifications for jurors or to grant exemptions from jury service in cases of special hardship or incapacity or to persons engaged in particular occupations whose uninterrupted performance of their duties is critical to the community's welfare. *See Taylor v. Louisiana*, *supra*, 419 U.S. at 538 ("States remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community").

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which the juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979). The Supreme Court has also repeatedly refused to extend the Sixth Amendment's fair cross-section requirement to the selection of a jury once a jury panel or venire has been constituted that does not run afoul of these requirements. *See Holland v. Illinois*, 493 U.S. 474, 486-87 (1990) (holding the Sixth Amendment's fair cross-section requirement does not mirror the Equal Protection Clause's proscription against racial discrimination in the exercise of peremptory challenges); *Teague v. Lane*, 489 U.S. 288, 314-15 (1989) (recognizing the denial of the right to a fair cross-section of the community in a jury venire does not undermine the fundamental fairness that must underlie a criminal conviction); *Lockhart v. McCree*, 476 U.S. 162, 173 (1986) ("We have never invoked the fair-cross-section principle to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large").

Petitioner has offered no evidence, statistical or otherwise, that reflects that African-Americans are or were under-represented in the central jury pool in East Baton Rouge Parish or

that the manner in which jury venires are or were constituted was discriminatory or subject to abuse. His speculative assertions regarding the possible effect of recent hurricanes upon the jury pool in this case is conclusory and entirely unsupported. The mere fact that one particular jury venire may exhibit disproportionality does not in any sense amount to proof that the State's system of constituting its central jury pool is unconstitutional or leads to the systematic exclusion of any particular group from the jury-selection process. Accordingly, as concluded in a case where similar assertions were made:

> The fundamental deficiency in petitioner's "fair cross-section" claim herein is that petitioner has alleged absolutely no specific facts showing the under-representation of Blacks on his particular jury venire was the result of any systematic exclusion of Blacks from petit jury service in Bexar County [Texas]. In fact, petitioner has failed to allege any specific facts showing that any jury venire in the history of Bexar County, other than his own, has ever included a statistically significant under-representation of Blacks or that such under-representation resulted from any cause other than pure statistical anomaly.

*Mass v. Quarterman*, 446 F. Supp. 2d 671, 695 (W.D. Tex. Aug. 21, 2006). Petitioner's claim herein suffers from the same deficiency and should be rejected for this reason.[4]

Petitioner's Claim No. 3, That The Prosecution
Engaged In Misconduct At Trial, Is Without Merit

Petitioner next asserts that the district attorney engaged in prosecutorial misconduct during closing arguments that resulted in prejudice to Petitioner. Specifically, Petitioner asserts that the prosecution (1) vouched for the credibility of the State's principal witness during closing argument, and (2) indirectly commented during closing argument upon Petitioner's failure to testify at trial.

---

4       Petitioner makes the unsupported assertion that a failure by State officials to send more jury letters or follow-up jury letters to certain neighborhoods with a high percentage of African-Americans within the community reflects a systematic deficiency. The Court finds no support in the record for this assertion.

Initially, as to all of the alleged improper remarks made by the prosecution, the Court notes that no objection was raised in connection therewith by Petitioner's attorney during trial. As a result, these claims were arguably waived by Petitioner's failure to assert a contemporaneous objection thereto.[5] Further, turning to a consideration of the prosecution's conduct within the context of the entire trial, the Court does not find that such conduct rises to the level of error that rendered Petitioner's trial fundamentally unfair.

Pursuant to *Brecht v. Abrahamson*, 507 U.S. 619 (1993), "a constitutional trial error is not so harmful as to entitle a defendant to habeas relief unless there is more than a mere reasonable possibility that it contributed to the verdict." *Nixon v. Epps*, 405 F.3d 318, 329-30 (5th Cir. 2005). It is only when the record is so evenly balanced that there is grave doubt as to whether the error had a substantial and injurious effect or influence in determining the jury's verdict that the error is not harmless. *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). The Fifth Circuit has articulated the *Brecht* standard as follows:

> [U]nder *Brecht*, a constitutional trial error is not so harmful as to entitle a defendant to habeas relief unless there is more than a mere reasonable possibility that it contributed to the verdict. It must have had a substantial effect or influence in determining the verdict. We recognize, however, that if our minds are in virtual equipoise as to the harmlessness, under the *Brecht* standard, of the error, then we must conclude that it was harmful. Moreover, the *Brecht* standard does not require in order for the error to be held harmful that there be a reasonable probability that absent the error the result would have been different.

*Woods v. Johnson*, 75 F.3d 1017, 1026-27 (5th Cir. 1996) (internal citations and quotation marks omitted). *See also Anderson v. Warden, Louisiana State Penitentiary*, 2013 WL 1405423, *3

---

5       Petitioner also asserts tangentially in the context of this claim that his attorney provided ineffective assistance at trial by failing to object to the statements made by the prosecution during closing argument. As discussed hereafter, however, inasmuch as the Court finds that the actions of the prosecution did not have a substantial and injurious effect or influence in determining the jury's verdict, Petitioner's claim of ineffective assistance with regard to this issue also fails.

(W.D. La. Mar. 19, 2013) ("[E]rrors in the form of improper prosecutorial comment or jury instructions are subject to harmless error analysis [under *Brecht*] … which asks whether the error had a substantial and injurious effect or influence in determining the jury's verdict").   Based upon a review of the record, the Court does not find that the prosecutor's comments, evaluated in the context of the entire trial, rendered Petitioner's trial fundamentally unfair.   The evidence adduced at trial, although subject to impeachment, provided ample evidence of Petitioner's guilt, and the offending comments complained of by Petitioner were not focused upon or emphasized and did not have a substantial injurious effect or influence in determining the verdict.

First, with regard to Petitioner's assertion that the prosecution vouched for the credibility of the principal witness, Kevin Lee, during closing argument, the Court finds, based upon the totality of the circumstances in this case, that the conduct of the prosecution in seemingly vouching for Lee's credibility was not so persistent and pronounced as to render Petitioner's trial fundamentally unfair, and that the evidence was not so insubstantial that in all probability, but for the prosecutor's remarks, Petitioner would not have been convicted.   While it is true that a prosecutor is not generally allowed to vouch for the credibility of a witness where there is an underlying implication that the prosecutor's statements are based on additional personal knowledge about the witness or about facts not in evidence, such comments are not necessarily improper if it is apparent to the jury that the views are based on an interpretation of the evidence presented at trial rather than on personal knowledge of facts outside the record.   *See Nicolos v. Scott*, 69 F.3d 1255 (5th Cir. 1995).   *See also Tyler v. Cain*, 2016 WL 1594609, *13 (W.D. La. Mar. 24, 2016), *citing United States v. Ellis*, 547 F.2d 863, 869 (5th Cir. 1977) ("The proper inquiry into this issue should be 'whether the prosecutor's expression might reasonably lead the jury to belief that there is other evidence, unknown or unavailable to the jury, on which the prosecutor

was convinced of the accused's guilt'"). In the instant case, there is no suggestion that the prosecutor's comments were based upon additional personal knowledge about the case or about the witness. To the contrary, several of the comments about the perceived credibility of the victim were more a reference to the witness' acknowledgements against interest at trial, that he had a prior felony drug conviction, that he was on parole at the time of the incident, that he was an admitted drug dealer at the time of the shooting (and had been for most of his life), and that he had been in possession of a firearm in his home, which is prohibited to a convicted felon and can lead to further incarceration. Thus, during the principal closing argument, the district attorney stated:

> On this witness stand, you saw the real Kevin Lee. He lied to you about nothing. He didn't lie about his convictions. He didn't lie about being on parole. He didn't lie that he was a drug dealer. He didn't lie about having a gun in the house. He lied about nothing. He had nothing to lie about.

Tr. at p. 131. And further:

> The man was honest. He didn't hide anything from you. He told you he was a drug dealer.

Tr. at p. 146. In addition, most of Petitioner's complaints relate to comments made by the prosecution during rebuttal argument on closing. In this regard, it is well-recognized that the prosecution is granted greater leeway in bolstering the credibility of a witness during rebuttal argument when the prosecution is responding to attacks on such credibility by the defense. *United States v. Ajaegbu*, 139 F.3d 898 (5th Cir. 1998) ("[T]he government may present a bolstering argument 'in rebuttal to assertions made by the defense counsel in order to remove any stigma cast' upon a witness"). *See also United States v. Young*, 470 U.S. 13 (1985) (recognizing that comments made by the prosecution to "right the scale" and respond to attacks upon credibility by the defense will not necessarily warrant reversal). Inasmuch as it was clear in this case that the Petitioner's principal defense was that the testimony of the principal witness and victim, Kevin

Lee, was not credible, the defense was entitled to respond thereto.[6]  Further, the potentially

objectionable comments made by the prosecution were based, not on any apparent outside personal

knowledge about the witness or facts not in evidence, but on a personal observation of the witness

on the stand.    Thus, the prosecutor stated:

> I submit to you that when he took that stand, I have never seen more passion.
> When I say passion, I mean I believed him when he told me who was the person
> that attempted to kill him.    I believed him when he told me why that person
> attempted to kill him.    I have not heard anything, I don't know any reason as to
> why he would pick this man who is married to his cousin that he has known for a
> while to say he shot him.

Tr. at p. 685.    And further:

> I listened to Mr. Kevin Lee's story.    And after I listened to Mr. Kevin Lee's story,
> I believed every word of it.

Tr. at p. 688.    And further:

> Why would he make this up? What is it that he has against this man that he's willing
> to make this up?    I don't get it.    I don't know.    I don't understand.    But I'll tell
> you what I do understand.    I understand his passion.

Tr. at p. 690.[7]

---

6    For example, in closing defense counsel stated:

> But the bigger tragedy, the bigger tragedy would be to put an
> innocent man in jail because of statements of one individual that got
> up here and lied to you and couldn't even remember the stories that
> he's told to you and the stories that he told to detectives three days
> after the incident.

Tr. at p. 135.    Defense Counsel further stated in closing arguments:

> There is no physical evidence whatsoever.    As I said before, the
> only testimony comes from Kevin Lee.    Not even Darius
> Brumfield, Kevin Lee.    How can you believe that testimony of
> Kevin Lee?

Tr. at p. 142.

7    Petitioner has referred to many other comments made by the prosecution during closing

Within the context of the entire trial, the Court does not find that the prosecutor's comments were so persistent or pronounced that they permeated the entire atmosphere of the trial, violated Petitioner's substantial rights, or infected the trial with unfairness. Further, to the extent that these comments were objectionable, the Court is unable to conclude that they rendered Petitioner's trial fundamentally unfair. "A criminal defendant seeking a reversal of his conviction for prosecutorial misconduct 'bears a substantial burden,'" and the Fifth Circuit has declined to reverse convictions even where the prosecutor's comments were admittedly inflammatory. *United States v. Delgado*, 672 F.3d 320, 337 (5th Cir. 2012), *quoting United States v. Virgen-Moreno*, 265 F.3d 276, 290 (5th Cir. 2001). As stated in *United States v. Delgado, supra*:

> Overturning a jury verdict for prosecutorial misconduct is appropriate only when, taken as a whole in the context of the entire case, the prosecutor's comments prejudicially affect[ed the] substantial rights of the defendant. In determining whether the defendant's substantial rights were affected, we consider three factors: (1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction. If the evidence to support a conviction is strong, then it is unlikely that the defendant was prejudiced by improper arguments of the prosecutor and reversal is not required.

*Id*. at 337 (citations and internal quotation marks omitted). In the instant case, the Court finds, as stated above, that the prosecutor's comments were not persistent or pronounced, were based upon inferences drawn from evidence in the record, and were principally made in responding on rebuttal to the defense's attack upon Kevin Lee's credibility. Further, although no cautionary instruction was requested or given, the jury was informed by the court that statements made by the prosecution were not evidence and that they were required to make their determination based solely upon the evidence presented and their independent evaluation of the credibility of the witnesses.

---

argument that he finds to be objectionable. *See* R. Doc. 1-1 at pp. 19-22. The Court has refrained from providing verbatim quotes of all of these comments and has singled out those that appear to be most potentially objectionable.

*See United States v. Ramirez*, 61 Fed. Appx. 121 (5th Cir. 2003); *Ayo v. Cain*, 2015 WL 8475523 *31 (E.D. La. Oct. 26, 2015) ("The jurors were properly instructed that they were not to consider the prosecutor's arguments as evidence, and '[j]urors are presumed to follow their instructions'"). Finally, the evidence against Petitioner was significant, with both eye-witness testimony from the victim, Kevin Lee, who was well-acquainted with Petitioner, and with corroborating testimony from Darius Brumfield with regard to what he saw and heard within the residence where the shooting took place.   Accordingly, in evaluating the prosecutor's comments in the context of the trial as a whole, this Court is unable to conclude that the comments had a substantial injurious effect upon the verdict in this case or that the state court made an unreasonable determination in concluding that this claim did not have merit.

With regard to Petitioner's assertion that the prosecution made indirect reference during closing argument to Petitioner's failure to testify at trial, the United States Supreme Court held, in *Griffin v. California*, 380 U.S. 609 (1965), that the Constitution forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt.   *Id.* at p. 615.   Notwithstanding, a *Griffin* error at trial is subject to harmless-error analysis, *Chapman v. California*, 386 U.S. 18, 25 (1967).   *See also Davis v. Quarterman*, 237 Fed. Appx. 903 (5th Cir. 2007) (applying the harmless error standard set forth in *Brecht v. Abrahamson, supra*, to a *Griffin* error at trial).   Further, a prosecutor's indirect comment violates *Griffin* only if it is manifestly intended to call attention to the defendant's failure to testify or is of such character that the jury would naturally and necessarily construe it as a comment on the defendant's silence. *Jackson v. Johnson*, 194 F.3d. 641, 652 (5th Cir. 1999).   In the instant case, the comments made by the prosecution during closing were brief and, in any event, were only an indirect reference to Petitioner's failure to testify.   Specifically, Petitioner points to the following statements made by

the prosecutor during closing:

> So why would Derek Moore be running from the police?

Tr. at p. 669.

> The scene was too bloody for fingerprints.   And even if he did, you know what his answer would be?   I was there earlier that day.   My fingerprints – this is my family, I go there all the time.   My fingerprints are supposed to be there.   My DNA works the same way.   If we would have found DNA in that house, he would have said my DNA is supposed to be at that house.   I'm always at that house.   That's my family.   That's what he would have told you.

Tr. at p. 686.

> So in my opinion, that eliminates all theories of there being someone else.   I didn't know, and it is possible he could have made that defense.   He could have said no, it was somebody else that was with him, somebody else, there was two different guns.

Tr. at p. 691-92.

> I'm going to tell you what his defense was going to be.   My guy was walking tin the neighborhood with a white shirt.   There is no way that you could say somebody saw him in that gray Navigator.

Tr. at p. 692.

> He signed a consent form for DNA testing.   Again, why not?   It was three days later, gun is gone, you know that.   You know you didn't leave any fingerprints…. You know that if you had twists and DNA was in your hair, you've cut that off, you don't have to worry about that.   Why not?   Why not give the DNA?   What are they going to test it against?

Tr. at p. 693-94.

Comments such as these, that arguably indirectly comment upon a defendant's failure to testify by noting that he possesses information that could rebut the charges against him or provide his version of events are subject to criticism when they are repetitive and pervasive.   *See Gongora v. Thaler*, 710 F.3d 267 (5th Cir. 2013) (involving repeated and blatant remarks and an inference of guilt stressed to the jury).   The passing comments in this case, however, are not such as would

warrant a reversal of Petitioner's conviction or that would lead the Court to conclude that his trial was fundamentally unfair.   The jury was informed by the Court that Petitioner was not required to testify and that no adverse inference could be drawn from his failure to do so.   In addition, Petitioner's attorney obtained from members of the jury venire during *voir dire* assurances that they understood that Petitioner was not required to testify and that they could not draw any adverse inference from Petitioner's failure to do so.   Accordingly, the above comments by the prosecution may not be seen to have had a substantial and injurious effect or influence in determining the jury's verdict.   *See Davis v. Quarterman, supra.   Cf., Anderson v. Nelson*, 390 U.S. 523, 523-24 (1968) ("comment on a defendant's failure to testify cannot be labeled harmless error in a case where such comment is extensive, where an inference of guilt is stressed to the jury as a basis of conviction, and where there is evidence that could have supported acquittal").   Accordingly, the Court finds that these comments did not constitute persistent or pronounced misconduct on the part of the prosecution that rendered Petitioner's trial fundamentally unfair or that likely affected the outcome of the trial.   Specifically, based upon the totality of the evidence in this case, including the trial court's instruction to the jury at the close of evidence, which included reminders regarding the State's burden of proof and the fact that a defendant could not be compelled to testify, the Court is unable to conclude that Petitioner has shown a substantial and injurious effect upon the verdict flowing from the indirect references.   Accordingly, the state court's determination that this claim was without merit was not an unreasonable application of federal law to the facts of this case.

Petitioner's Claim No. 4, That He Was Provided With
Ineffective Assistance Of Counsel At Trial, Is Without Merit

Petitioner next asserts that he was provided with ineffective assistance of trial counsel in several respects.   In this regard, a habeas petitioner who asserts that he has been provided with ineffective assistance of counsel must affirmatively demonstrate (1) that his counsel's performance

was "deficient", *i.e.*, that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment; and (2) that the deficient performance prejudiced his defense, *i.e.*, that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial in which the result is reliable. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Petitioner must make both showings in order to obtain habeas relief based upon the alleged ineffective assistance of counsel. *Id.*

To satisfy the deficiency prong of the *Strickland* standard, Petitioner must demonstrate that his counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional standards. *See, e.g., Brown v. Dretke*, 419 F.3d 365, 374 (5th Cir. 2005). The reviewing court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional competence and that, under the circumstances, the challenged action might be considered sound trial strategy. *See id. See also Bridge v. Lynaugh*, 838 F.2d 770, 773 (5th Cir. 1988). This Court, therefore, must make every effort to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time of trial. *Strickland v. Washington, supra*, 466 U.S. 689; *Martin v. McCotter,* 796 F.2d 813, 817 (5th Cir. 1986). Great deference is given to counsel's exercise of professional judgment. *Id.*

If Petitioner satisfies the first prong of the *Strickland* test, his petition nonetheless must affirmatively demonstrate prejudice resulting from the alleged errors. *See Premo v. Moore*, 562 U.S. 115, 122 (2011) ("To establish ineffective assistance of counsel, 'a defendant must show both deficient performance by counsel and prejudice"). To satisfy the prejudice prong of the *Strickland* test, it is not sufficient for Petitioner to show that the alleged errors had some conceivable effect on the outcome of the proceeding. *Strickland v. Washington, supra*, 466 U.S. at 693. Rather, Petitioner must show a reasonable probability that, but for counsel's alleged

errors, the result of the proceeding would have been different. *Williams v. Taylor*, 529 U.S. 362, 391 (2000). A habeas petitioner need not show that his counsel's alleged errors "more likely than not" altered the outcome of the case; he must instead show a probability that the errors are "sufficient to undermine confidence in the outcome." *Id.* Both the *Strickland* standard for ineffective assistance of counsel and the standard for federal habeas review of state court decisions under 28 U.S.C. § 2254(d)(1) are highly deferential, and when the two apply in tandem, the review by federal courts is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

The above showing is one that Petitioner cannot make in the instant case. Petitioner asserts in this regard that his trial attorney failed to interview three potential witnesses prior to trial. According to Petitioner, his attorney failed to interview an alibi witness, David Johnson, who allegedly would have testified that Petitioner was with him at a strip club, "Dancers" on Airline Highway, on the night of the shootings, and failed to interview two individuals, Orlicia Williams (Petitioner's wife) and Hilda Kelly (Petitioner's relative by marriage), who allegedly would have testified that they were present on an unspecified occasion when the victim, Kevin Lee, stated that he wasn't completely sure that Petitioner was the shooter. According to Petitioner, his wife Orlicia also would have testified that she picked Petitioner up from the referenced strip club that evening, and Hilda Kelly would have refuted the assertion by Lee that Petitioner collected two firearms from Lee's aunt's house on the day of the shooting.

Notwithstanding the foregoing, although Petitioner asserts that he advised his attorney of the above-referenced witnesses prior to trial, this assertion is not supported by the record. Initially, with regard to David Johnson, the record reflects that on the second day of trial, after jury selection had begun, Petitioner's attorney advised the court that he wished to include David Williams as an alibi witness for trial. In doing so, Petitioner's attorney stated in open court that

Petitioner had not informed him of the identity of the alibi witness until the previous day.   Tr. at p. 258-61.   This assertion by Petitioner's attorney is supported by the attorney's notes from his initial consultation with Petitioner which reflect, as apparently conceded by Petitioner, that the focus of that consultation was Petitioner's assurance that Kevin Lee would not testify at trial and so would not identify Petitioner as the offender.   *See* Exhibit E to Petitioner's PCR application. This reliance by Petitioner on the purported unwillingness of Kevin Lee to testify at trial also undermines Petitioner's present assertion that he planned to rely upon an alibi witness to refute the charges against him.   Ultimately, the trial court accepted the assertion by Petitioner's attorney that no prior notification had been provided by Petitioner relative to the identity of the alibi witness and concluded that the failure by Petitioner to provide this information to his attorney prior to that date was not good cause for the late identification of the witness.   As for witnesses Orlicia Williams and Hilda Kelly, the record contains only Petitioner's conclusory assertions in his PCR application that he informed his attorney of the potential testimony of these individuals, and there was no mention of these witnesses at trial.

It is beyond cavil that "an attorney must engage in a reasonable amount of pretrial investigation and 'at a minimum, … interview potential witnesses and … make an independent investigation of the facts and circumstances in the case….'"   *Harrison v. Quarterman*, 496 F.3d 419, 425 (5th Cir. 2007), *quoting Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994).   However, an applicant "who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial."   *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010), *quoting United States v. Green*. 882 F.2d 999, 1003 (5th Cir. 1989).   To prevail on an ineffective assistance claim based upon uncalled witnesses, an applicant must name the witness, demonstrate that the witness would

have testified, set out the content of the witness' proposed testimony, and show that the testimony would have been favorable.  *See Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). Claims of uncalled witnesses are disfavored, however, especially if the claim is unsupported by evidence indicating the witness' willingness to testify and the substance of the proposed testimony. *See Harrison v. Quarterman*, 496 F.3d 419, 428 (5th Cir. 2007).   Conclusory statements regarding the content of the uncalled witness' testimony are insufficient to demonstrate ineffective assistance.  *Gregory v. Thaler, supra*.   Therefore, when "the only evidence of a missing witnesses' [sic] testimony is from the defendant, this Court views the claims of ineffective assistance with great caution."   *Sayre v. Anderson*, 238 F.3d 631, 636 (5th Cir. 2001). Ordinarily, a petitioner's failure to present some evidence from the uncalled witness regarding that witness' potential testimony and willingness to testify will be fatal to an ineffective assistance claim.   *Id.   See also Alexander v. McCotter, supra*, 775 F.2d at 602.

In addition to the foregoing, while an attorney must engage in a reasonable amount of pretrial investigation, "the reasonableness of an attorney's investigation may critically depend on the information forwarded by the defendant and the defendant's own strategic decisions about his representation."   *Bryant v. Scott, supra*, 28 F.3d at 1415.   In *Bryant*, the Fifth Circuit concluded that petitioner's attorney had provided ineffective assistance by failing to contact or interview alibi witnesses that he first learned about three days prior to trial.   Whereas the *Bryant* court found no ineffective assistance in failing to investigate these witnesses *prior to* the information being provided by petitioner, the court concluded that the attorney's complete failure to attempt to contact the alibi witnesses during the ensuing three days amounted to ineffective assistance. *Bryant*, however, is distinguishable from the instant case.   In *Bryant*, petitioner's attorney had long been informed of petitioner's wish to obtain the presence of out-of-state alibi witnesses, and

the record in that case was found to be, in contrast to most cases involving claims of uncalled witnesses, "saturated with the unexpected testimony of Petitioner's 'alibi' witnesses." *Id*. at n. 5. In the instant case, in contrast, Petitioner's attorney waited until the second day of trial, during *voir dire*, to inform the court of an alibi witness, David Johnson, and stated to the court that Petitioner had waited until the day before to provide the identity and telephone number of the alibi witness. Petitioner's attorney then, in accordance with Louisiana procedure, submitted a formal written notice of alibi witness, including David Johnson's address (which Petitioner had not known), suggesting that Petitioner's attorney utilized the telephone number to investigate and locate the witness. Whereas the notice of alibi witness was opposed by the prosecution and ultimately rejected by the trial court, the failure of Petitioner's attorney to investigate or interview this witness prior to that time should not be attributed to an attorney who was not previously provided with the requisite information. *See Pape v. Thaler*, 645 F.3d 281 (5th Cir. 2011) (distinguishing *Bryant* and finding no ineffective assistance of counsel where petitioner failed to supply counsel with the names of witnesses who only later provided affidavits stating that they would have testified in favor of petitioner).

Finally, as noted above, the failure of a petitioner to provide some evidence to support his conclusory claims regarding what additional investigation would have disclosed or what uncalled witnesses would have said is normally fatal to a claim of ineffective assistance of counsel. In the instant case, Petitioner has made no effort to produce, either before the state trial court on PCR review or before this Court, affidavits or testimonial statements from David Johnson, his wife Orlicia Williams or Hilda Kelly, his relative by marriage, to demonstrate the substance of their testimony, that they were available and willing to testify if called, and that their testimony would have been favorable to Petitioner. Nor is there any explanation or reasonable justification

provided as to why Petitioner was unable to procure this information.  *See Harrison v. Quarterman*, 496 F.3d 419, 428 (5th Cir. 2007) (remanding for further factual development, but noting that petitioner's failure to present evidence before the state court may have been justified by restrictions placed upon his ability to communicate with the incarcerated witness).  Nor has Petitioner presented an affidavit from his trial attorney regarding the extent of the attorney's investigation or whether he did in fact interview either Petitioner's wife or Hilda Kelly before trial and in fact determined that their testimony would not be helpful.  In cases where a failure to investigate has been seriously entertained, the petitioner has generally presented corroborating affidavits before the state court – or testimony at a hearing scheduled in that venue – to bolster his conclusory claims regarding the purported testimony of un-investigated or uncalled witnesses. *See, e.g., Pape v. Thaler, supra* (noting that "[i]n state court, Pape submitted affidavits from friends and extended family members who stated that if counsel had tried to contact them before trial, they would have testified"); *Kately v. Cain*, 704 F.3d 356 (5th Cir. 2013) (reversing a grant of federal habeas relief in the district court and referring to testimony provided at a state court evidentiary hearing where petitioner's attorney and purported alibi witnesses testified); *Perez v. Davis*, 2016 WL 5341899, *4 (S.D. Tex. Sept 23, 2016) (referring to affidavits presented in state court by the uncalled witness and petitioner's attorney); *Taylor v. Cain*, 2013 WL 5718543, *15 (W.D. La. Oct. 21, 2013) (noting that the court "cannot speculate as to how [un-investigated] witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses").  In contrast, where no such evidence is presented, such claims have been dismissed as without factual basis.  *See Lewis v. Cain*, 444 Fed. Appx. 835 (5th Cir. 2011) (rejecting claim where petitioner "failed to provide any evidence from witness herself showing that she was willing to testify and setting out the content of her expected testimony"); *Gregory v.*

*Thaler*, 601 F.3d 347, 352 (5th Cir. 2010) (rejecting claim where affidavits that had been provided in connection with petitioner's state court proceedings were not provided in connection with the federal habeas proceeding and so were not properly before the court); *United States v. Zuniga*, 2012 WL 642061 *15 (S.D. Tex. Feb. 24, 2012) (rejecting claim and noting that "[t]here is insufficient evidence before this Court that Jimenez would have been available to testify or would have testified to what [petitioner] claims"); *Brown v. Cain*, 1998 WL 274245, *2 (E.D. La. May 21, 1998) (rejecting claim where "affidavit" presented by petitioner in state court was not in proper form and so had "no evidentiary value" in support of his claims). Accordingly, based on the foregoing, the Court concludes that Petitioner in this case has not made a sufficient evidentiary showing to support his failure-to-investigate claim.

In addition to the foregoing, the Court also finds that Petitioner has failed to adequately show that he was prejudiced by his attorney's alleged failures or that the result of the proceedings likely would have been different had the un-called witnesses been presented. All that Plaintiff has alleged as to the purported alibi witness, David Johnson, is that the witness would have testified that the witness and Petitioner were together at a strip club on the night of the shooting. No information has been provided, however, as to the times that the parties were at that location, as to when Petitioner was allegedly picked up there by his wife, or as to the willingness of the witnesses to testify as Petitioner claims. In contrast, pursuant to the evidence adduced at trial, the shooting on the night of March 16, 2007 elapsed during a period of no more than ten or fifteen minutes from start to finish, with the offender knocking on the door to Lee's residence shortly before 10:30 p.m., confronting Lee's wife and forcing her to lead him to the bathroom – all the while asking about the whereabouts of "Gilbert" – opening the door to the bathroom and shooting Lee seven times, exiting the bathroom and shooting the decedent twice, and then departing the residence in a

vehicle. Even accepting the conclusory assertions of Petitioner that Johnson would have testified

that he and Petitioner were present at a strip club on the evening of the shooting and that

Petitioner's wife picked him up from the strip club that evening, neither assertion provides specific

detailed information regarding Petitioner's location at the time of the shooting. Further,

considering Lee's eyewitness identification of Petitioner as the shooter, both to police and at trial,

and considering Lee's familiarity with Petitioner, who was his cousin by marriage and who he had

known for several years, there is little likelihood that testimony by Petitioner's wife and relative –

that on an unspecified occasion Lee allegedly signified some degree of hesitancy regarding the

identity of Lee as the shooter – would have altered the jury's verdict.[8]   Accordingly, Petitioner's

claim in this regard should be rejected.

Petitioner's Claim No.5, Regarding The Alleged
Insufficiency Of The Evidence, Is Without Merit

The standard for testing the sufficiency of the evidence on federal habeas corpus review is

whether, after viewing the evidence in the light most favorable to the prosecution, any rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Knox v. Butler*, 884 F.2d 849, 851 (5th Cir. 1989).

This standard of review applies in both direct and circumstantial evidence cases.   *United States v.*

*Terrell*, 700 F.3d 755, 760 (5th Cir. 2012).   In reviewing the sufficiency of the evidence under

---

[8]     With regard to the purported testimony of Hilda Kelly that Petitioner asserts would
allegedly have refuted Lee's assertion that Petitioner stopped at Lee's aunt's house on the
afternoon of the shooting to obtain two firearms, there is no factual basis provided for the witness'
proposed testimony.   For example, even assuming that Hilda Kelly is the person described as
"Lee's aunt," from whose house the firearms were allegedly obtained, there is no information
provided as to whether and when Hilda Kelly was present in the house on the afternoon of March
16, 2007, whether or not Petitioner came to the house that afternoon, and whether she would have
been in a position to ascertain whether Petitioner obtained something from the house before
leaving.

this standard, the federal habeas court must defer to the state court fact-finder's evaluation of the credibility of witnesses and the resolution of conflicts in the evidence. *Knox v. Butler, supra*, 884 F.2d at 851. *See also Galvan v. Cockrell*, 293 F.3d 760, 764 (5th Cir. 2002); *Hosey v. Goff*, 2013 WL 1500883, *2 (S.D. Miss. March 11, 2013). Further, the federal habeas court's consideration of the sufficiency of the evidence is limited to a review of the record evidence adduced at the petitioner's state court trial. *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005); *Knox v. Butler, supra*, 884 F.2d at 852 n. 7. State law defines the substantive elements of the offense, and a state judicial determination that the evidence was sufficient to establish the elements of the offense is entitled to great weight on federal habeas review. *Dickinson v. Cain*, 211 F.3d 126, *5 (5th Cir. 2000); *Hawkins v. Lynaugh*, 844 F.2d 1132, 1134 (5th Cir. 1988).

In attacking the sufficiency of the evidence in this case, Petitioner asserts that there was insufficient evidence to establish that he was the perpetrator of the offenses that occurred on March 16, 2007. In doing so, he points to the purported unreliability of Lee who was an admitted drug dealer and convicted felon. Notwithstanding, as noted by the state court on direct appeal, it is not the function of a reviewing court to determine what the jury could have found if only it had viewed the evidence differently. Instead, the court's role is to determine whether the evidence, viewed in a light most favorable to the prosecution, was sufficient to prove every element of the offenses beyond a reasonable doubt. In addition, as noted above, this Court is limited to determining whether the Louisiana courts unreasonably applied the due process standards of *Jackson v. Virginia, supra*, in affirming Petitioner's convictions. Under 28 U.S.C. § 2254(e)(1), a determination of a factual issue shall be presumed correct, and Petitioner has the burden of rebutting this presumption of correctness by clear and convincing evidence.

In light of the foregoing standard, the Court finds no unreasonable application of *Jackson*

*v. Virginia* and the Due Process Clause.   Viewing the evidence in the light most favorable to the prosecution, the jury could have believed that Petitioner was the perpetrator of the shootings.   The testimony of only a single eye-witness is sufficient to support a verdict.   *See Gordon v. Cain*, 2013 WL 3070858, *15 (E.D. La. June 17, 2013).   Lee knew Petitioner well and identified him as the shooter both to police and at trial.   There was testimony that Lee's wife referred to the shooter as being Lee's "cousin Dot" when he arrived at the house, and she allegedly stated repeatedly after being shot, "why your cousin shot me."   Lee's stepson, Darius, overheard the shooter asking for "Gilbert" and testified that Petitioner referred to the shooter as being "Dot," which was the nickname Petitioner was known by.   Finally, the evidence at trial disclosed that Petitioner fled from police when they attempted to apprehend them several days after the shooting, and the fact of flight creates a permissible inference of guilt under certain circumstance.   *See United States v. Myers*, 550 F.2d 1036 (5th Cir. 1977).   Accordingly, based on the foregoing, this Court is unable to conclude that the state court unreasonably applied the standard set forth in *Jackson v. Virginia, supra*, and Petitioner's contention is without merit relative to this claim.

Petitioner's Claim No.6, That The Trial Court Failed To Conduct A Balancing
Test Before Excluding Testimony From His Alibi Witness, Is Without Merit

Finally, Petitioner asserts that the trial court erred in excluding testimony from his alibi witness, David Johnson, and should have conducted a balancing test before determining that Petitioner had not shown good cause for the late identification of the witness.   In this regard, La. Code Crim. P. art. 727 provides:

> A.   Upon written demand of the district attorney stating the time, date, and place at which the alleged offense was committed, the defendant shall serve within ten days, or at such different time as the court may direct, upon the district attorney a written notice of his intention to offer a defense of alibi.   Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom he intends to rely to establish such alibi.

B. Within ten days thereafter, but in no event less than ten days before trial, unless the court otherwise directs, the district attorney shall serve upon the defendant or his attorney a written notice stating the names and addresses of the witnesses upon whom the state intends to rely to establish the defendant's presence at the scene of the alleged offense and any other witnesses to be relied on to rebut testimony of any of the defendant's alibi witnesses.

C. If prior to or during trial, a party learns of an additional witness whose identity, if known, should have been included in the information furnished under Subsection A or B, the party shall promptly notify the other party or his attorney of the existence and identity of such additional witness.

D. Upon the failure of either party to comply with the requirements of this rule, the court may exclude the testimony of any undisclosed witness offered by such party as to the defendant's absence from or presence at, the scene of the alleged offense. This rule shall not limit the right of the defendant to testify in his own behalf.

E. For good cause shown, the court may grant an exception to any of the requirements of Subsections A through D of this Section.

In concluding that Petitioner had failed to show good cause for his late notice, the trial court accepted the assertion by Petitioner's attorney that the identity of the alibi witness had only been provided to counsel after the trial commenced. On direct appeal, the First Circuit Court of Appeals accepted this conclusion, finding no abuse of discretion and finding that Petitioner's untimeliness created "a reasonable inference that the defendant was deliberately seeking a tactical advantage in failing to give notice" in a timely fashion. This conclusion is not unreasonable.

The Compulsory Process Clause of the Sixth Amendment may, in certain cases, be violated by the imposition of a discovery sanction that entirely excludes the testimony of a material defense witness. However, the Sixth Amendment does not create an absolute bar to the preclusion of the testimony of a surprise defense witness. *Taylor v. Illinois*, 484 U.S. 400, 409-410 (1988). Several years after *Taylor*, the Supreme Court again stated that there is no *per se* bar against the exclusion of testimony for failure to comply with discovery rules. *Michigan v. Lucas*, 500 U.S.

145 (1991). Notwithstanding, *Taylor* makes clear that, while a "trial court may not ignore the fundamental character of the defendant's right to offer testimony of witnesses in his favor," that right does not "automatically and invariably outweigh countervailing public interests." *Taylor v. Illinois, supra*, 484 U.S. at 414. The right must be weighed against "the integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administrative of justice, and the potential prejudice to the truth-determining function of the trial process." *Id.* at 414-15. Whereas the *Taylor* Court noted that "alternative sanctions are adequate and appropriate in most cases," the Court further stated:

> A trial judge may certainly insist on an explanation for a party's failure to comply with a request to identify his or her witnesses in advance of trial. If that explanation reveals that the omission was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence, it would be entirely consistent with the purpose of the Compulsory Process Clause simply to exclude the witness' testimony.

*Id.* at 415. The *Taylor* Court specifically considered the state's interest "in protecting itself against an eleventh-hour defense," and the purpose of discovery to "minimize the risk that a judgment will be predicated on incomplete, misleading, or even deliberately fabricated testimony." *Id.* at 411-12.

In the instant case, the trial court clearly concluded that by waiting until the date of trial and the commencement of *voir dire* to provide notice of a purported alibi witness, Petitioner was unable to show good cause for the late notice under La. Code Crim. P. art. 727(E). In upholding this determination on direct appeal, the appellate court noted and distinguished the contrary decision of *Toney v. Miller*, 564 F. Supp. 2d 577 (E.D. La. June 4, 2008). In *Toney*, the late notification of two alibi witnesses was found to have been justified because there was no

suggestion in that case that the late notice had been undertaken with any improper motivation.   To

the contrary, the state was found to have had notice of the potential alibi witnesses by virtue of

statements made by the witnesses to police during the initial investigation and by virtue of the fact

that petitioner's prior attorney had in fact informally advised the prosecution, more than a month

before trial, of the existence of an alibi witness and of an intention to present alibi testimony.   In

addition, the petitioner in *Toney* had obtained new counsel shortly before trial, and this was found

to have contributed to the confusion in identifying the witnesses.   In the instant case, in contrast,

there is no indication that any of the factors in *Toney* are present to justify the late notice provided

by Petitioner herein.   Accordingly, the appellate court upheld the trial court's decision, finding no

abuse of discretion in the trial court's exclusion of the witness' testimony.   *See State v. Moore*,

*supra*, 2010 WL 1838314, *4.   This determination by the trial courts is not an unreasonable

application of federal law to the facts of this case.   *See Lewis v. Cain, supra*, 444 Fed. Appx. at

835 (upholding the exclusion of testimony from an alibi witness because of late notification and

specifically noting that petitioner had failed in any event to provide any evidence, in the form of

an affidavit or otherwise, of the substance of the witness' testimony or that the witness was

available and willing to testify at trial); *State v. Romero*, 2011 WL 309183, *7-8 (La. App. 3 Cir.

Feb. 2, 2011) (distinguishing *Toney* and upholding the exclusion of alibi witnesses).

Accordingly, based on the foregoing, the Court concludes that Petitioner's application for

habeas corpus relief should be denied.

<u>Certificate Of Appealability</u>

An appeal may not be taken to the court of appeals from a final order in a habeas corpus

proceeding "unless a circuit justice or judge issues a certificate of appealability."   28 U.S.C. §

2253(c)(1)(A).   Although the Petitioner has not yet filed a Notice of Appeal herein, the Court may

address whether he would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). A certificate of appealability may issue only if a habeas petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). In cases where the Court has rejected a petitioner's constitutional claims on substantive grounds, a petitioner must demonstrate that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005), *quoting Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In the instant case, the Court finds that reasonable jurists would not debate the denial of the Petitioner's § 2254 application or the correctness of the procedural or substantive ruling. Accordingly, it is appropriate that, in the event that the Petitioner seeks to pursue an appeal in this case, a certificate of appealability be denied.

<u>RECOMMENDATION</u>

It is recommended that Petitioner's application for habeas corpus be denied, and that this proceeding be dismissed, with prejudice. It is further recommended that, in the event that Petitioner seeks to pursue an appeal in this case, a certificate of appealability be denied.

Signed in Baton Rouge, Louisiana, on September 7, 2017.

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**